RECEIVED **UNITED STATES COURT OF APPEALS**

MAR – 6 2013

**FOR THE SIXT CIRCUIT**

DEBORAH S. HUNT, Clerk

**FILED**

MAR 0 6 2013

DEBORAH S. HUNT, Clerk

Lorne Armstrong

Appellant

v.

United States of America

Appellee

12-6543

# RESPONSE TO UNITED STATES MOTION TO

# DISMISS SECOND OR SUCCESSIVE MOTION

# TO VACATE, SET ASIDE, OR CORRECT SENTENCE

# PURSUANT TO 28 U.S.C. § 2255

In response to United States comment on Appellant not having newly-discovered evidence to support an entrapment defense (Appellant **does** have it), Appellant was able to obtain the evidence **after** getting out of incarceration, which is something he should not have had to endure but did because of the prosecution with-holding evidence that was vital to any decision being made toward whether or not to plead guilty. This prosecutorial misconduct was shameful, pathetic and disgusting to say the least.

# ARGUMENT I

Any plea agreement cannot be made without full understanding that the legal system **must**, by law, provide all evidence to the accused, including exculpatory evidence. The prosecution figured that if Appellant was threatened with a bogus charge that held more time then Appellant would agree to anything to make sure he didn't end up with a substantial amount of time incarcerated. Therefore, the prosecutor added in the "binding agreement" to make sure Appellant would have less of a chance of finding out the truth and attacking his bogus conviction. However, Appellant has found the evidence to support his claims and understands the law a little more clearly now verses when he was first incarcerated.

The United States Attorney was suppose to include all evidence in with Appellant's discovery package, including any and all exculpatory evidence. Besides the DVD's being edited and 149 pages missing from the "chat log" as well as the "chat log" being [d]octored, the prosecution also with-held crucial evidence from Appellant and Appellant's attorney at the time. This evidence was vital information needed to support an entrapment defense. The prosecution with-held the evidence of the sting being authorized by Commonwealth of Kentucky Attorney General, Greg Stumbo. The United States Attorney knew that without this information there could be no chance of an entrapment defense taking place.

In Appellant's initial 2255 Appellant had motioned the District Court multiple times to force

the United States Attorney to hand over [all] evidence, including exculpatory evidence and the U.S. Attorney had stated they had turned over all the evidence they had. This was not true. They knew the Commonwealth of Kentucky Attorney General, Greg Stumbo, had authorized the sting but would not turn over that evidence. They also knew that there was 149 pages missing from the "chat log" and they knew the DVD's had been edited as well as the "chat log" being altered. Appellant still was unable to get the un-tainted evidence he needed and all exculpatory evidence held by the U.S. Attorney. A defendant cannot make any stable decision without first viewing all the evidence that applies to his case. Nor can the defendant's attorney give sound advice without all the evidence to investigate the case. **Brady v. Marland,** "the prosecution must disclose all material, exculpatory evidence to a defendant, irrespective of whether the failure to disclose was done in good or bad faith."

Under Rule 11 of the Federal Rules of Criminal Procedure, before accepting Petitioner's guilty plea, the court ensures that the plea is voluntary, knowing and intelligent and did not result from **force, threats,** or promises. Further the court has an obligation to ascertain whether Petitioner was competent to enter a guilty plea.

**Exhibit A** is a note written by Appellant's attorney, Scott Wendelsdorf, telling about the threat by the United States Attorney to push Appellant to plead guilty. This was not only a threat but also a means of force to push Appellant to plead guilty even though the prosecution had not given all the required evidence to Appellant. Further, Appellant could in no way make a sound decision because of the depression and emotional problems he was going through.

3

Even though it was being treated and Appellant thought the decision he was making was sound because of the advice of his counsel, he had no idea of the illegalities that had taken place, it was his attorney's job to investigate all aspects of the case and give Appellant sound advice. Counsel in no way gave sound advice and could not give sound advice because he did not apply himself to investigate any areas of Appellant's case even when Appellant had offered up evidence that should have been obvious to counsel. Such as the Miranda rights.

Speaking of sound advice and evidence, Appellant would like to discuss the effectiveness of his attorney but would first like to state that Appellant is a pro se petitioner, not a lawyer and is learning the legal system as he goes. Such as the language the legal system uses. If Appellant understood the wording of the motions and documents of the United States Attorney and courts then Appellant would have given a list of things his attorney failed to do a long time ago, instead of just now figuring out that what is needed is Appellant stating what his court appointed attorney had failed to do.

Appellant will now put forth the list of facts that his court appointed attorney had failed to do.

1) When Appellant was threatened by the prosecution with the additional charge of "attempted production of child pornography" Appellant had told his federal attorney of proof for the camera being in his truck was because he had tried to pawn it at three different pawn shops for money for gas for work but the pawn shops wouldn't take it because it had duct tape holding the batteries cover in place, and had even given attorney

4

the directions to the pawn shops on Nolensville Pike, in Nashville, TN. He had also told his federal attorney that they had video camera proof in those pawn shops of Appellant trying to pawn his camera but his court appointed attorney had never investigated it.

2) There is a checklist that attorney's use for pre-trial publicity, at the time Appellant did not know of the illegalities of the press putting forth a show like they did where it paints the Appellant in the worst light possible so he had no hope for a fair trial. Attorney never discussed the illegalities of the show being aired and the Appellant's right to a fair trial and fair and impartial jury or anything to do with pre-trial publicity. Counsel should have and could have gone into extensive detail with this because there is a list of options that are put forth. The first three questions on the "Attorney's Checklist: Pretrial Publicity" are: (1) How extensive is it (beyond specific locality)? (In Appellant's case it was world-wide). (2) What information was conveyed (e.g., confessions vs. statements of character witness)? (In Appellant's case it was information that violated Appellant's Miranda rights). (3) Would it be prejudicial (impact on jurors)? (In Appellant's case there was no doubt that it would have had an impact on jurors because it showed Appellant in the worst light possible before any court proceedings began).

Appellant's attorney should have put in a motion also for NBC to wait to air the show until after the outcome of his case.

In this Attorney's Checklist there is also a list of Constitutional Solutions that holds 8 different solutions in it. Appellant's court appointed attorney never discussed any of these

5

solutions with Appellant or gave any hint that any of the actions that were performed by the

authorities were illegal.

3) There should have been a "given" to counsel right off the bat when the host of the television

show "To Catch A Predator" came out and started interrogating Appellant without reading him

his Miranda rights.  Under U.S. Constitutional Amend. V – "protects compelled disclosure of

incriminating information, not information that is merely private."

Appellant was in a forced situation to divulge information that was incriminating when he

was not read his Miranda rights by someone working "under the color" of law.

4) Appellant's attorney should have investigated how the press got ahold of evidence that was

suppose to be in the hands of only those so authorized by the government to have it.

Under the 6th Amendment -162. Generally it states:

Neither press nor public has right to be contemporaneously informed by police or
prosecuting authorities concerning details of evidence being accumulated against defendant.
Sheppard v. Maxwell (1966) 384 U.S. 333 16 L.Ed.23d 600.

In Fruehauf Corp. v. Thornton, 507 F.2d 1253, October 10, 1974 it states:

We are of the view that the Freedom of Information Act was not intended to serve as a
substitute for criminal discovery.

5) Appellant's attorney should have investigated the media's presence at the "sting" house.  In

Stack v. Killian, 96 F.3d 159, 162 (6th Cir. 1996) it states:

"Officers in 'unquestioned command' of a dwelling may ... exceed the scope of the authority
implicitly granted them by their warrant when they permit unauthorized invasions of privacy by

third parties who have no connection to the search warrant or the officers' purposes for being on the premises."

6) Appellant's attorney should have investigated the authorization of the sting. It wasn't until Appellant had already served five (5) years in prison, got released and was home that he found the evidence that was with-held by the United States Attorney's Office and the Commonwealth of Kentucky Attorney General's Office (Greg Stumbo), even with the assistance of Kentucky state post-conviction attorney, who was only allowed to ask interrogatories. **Exhibit B.**

7) Appellant's attorney never investigated the worthiness of the evidence or the evidence itself. Appellant had told his attorney that there was 149 pages missing out of 407 and that there was things in the "chat log" conversation that was not said by Appellant, such as "having anal sex" with the "13 year old girl". Armstrong will not have anal sex with an adult female much less a minor female. Appellant had also told his attorney there were things that was missing that was said by Appellant and the "decoy" such as, on page AR0025 (**Exhibit B-1**)on 9/17/2007 07:13:47 PM "decoy" asks, "wat they mean by a purv wats that". Armstrong had asked her "where do you see that?" and "decoy's" response was, "in the room". They show that the next thing Armstrong says is "hmm lol" on 9/17/2007 07:13: 56 PM. There's 11 seconds of silence between the two time stamps. There was not 11 seconds of silence between "decoy" and Armstrong during the actual conversation. If one were to look at the time stamps they would see there was space in them where nothing was said. Appellant had told his attorney that things were missing from the conversation and there were things in the

7

conversation that was not said but his attorney waived it off and never did any investigating on it. That is also where they initiated the sex talk.   With 149 pages missing, that was something that should have raised a "red flag" with court appointed attorney, Scott Wendelsdorf. Also was the DVD's. Attorney's federal investigator asked Appellant if he would like to view the DVD's of the discovery and Appellant had told him "Yes". Attorney's federal investigator lied and told attorney that the Appellant would not like to view the DVD's. **Exhibit C**.

Appellant told federal investigator that he did not want to view the pictures but did want to view the DVD's. Appellant also had told federal investigator that he expected he "might" have to take a plea but didn't know because he hadn't seen all the evidence yet and hadn't discussed it with his court appointed attorney. The federal investigator graciously decided to leave out important facts that was in the conversation he and Appellant had that day. Needless to say, Appellant never got to see the DVD's until he was transferred to Kentucky State Reformatory and that was when he found out just how much had been edited from them. However, the federal investigator should never have asked if Armstrong wanted to see the DVD's, he had an obligation to show the DVD's to Armstrong to make sure they weren't tampered with. Attorney intentionally found a way to avoid showing Armstrong the DVD's because he knew they had been tampered with. He knew that Armstrong was already making him aware of the "chat log" being tampered with. He was only interested in assisting the prosecution secure a conviction.

(8) Appellant's court appointed attorney never investigated the character of any of the so called "witnesses" involved in the sting set-up. If he had he would have found that they were

not reliable witnesses and did not like revealing their real motives and had dodged court orders on more than one occasion to suit their own benefit. Such as the evidence shown in the Supplemental motions to the Rule 60(b) motion.

(9) Appellant's court appointed attorney should have investigated the prosecutor with-holding any exculpatory evidence. Such as the authorization of the sting. (**Exhibit B**). The prosecution is suppose to receive **all** evidence involved in the operation of such a sting including exculpatory. The prosecution therefore had the evidence but would not release it to Appellant's attorney. The same is true for Appellant's state case. That's the reason the state post-conviction attorney was only allowed to ask interrogatories.

10) Appellant's court appointed attorney should have asked the prosecutor for more time to go over the plea bargain with Appellant. The plea bargain was sent to Appellant on March 20, 2008, which was on a Thursday. (**Exhibit E-1, E-2, E-3**) The Appellant did not receive it until March 23, 2008 from the jail, which was on a Sunday. The United States Attorney wanted an answer by March 26, 2008. Appellant's attorney stated that he needed an answer by March 25, 2008. Appellant had tried to call his attorney on Monday, March 24, 2008 and could not get ahold of him to talk about the plea bargain. He then called on Tuesday, March 25, 2008. Appellant did not think he had any choice but to give an answer right away and attorney gave him no reason to believe that he could talk to the prosecution to get more time. There was no way that Appellant could give a "thought through" response. He could only make a rash decision and Appellant had told attorney that he had no choice but to make a rash decision.

9

**Exhibit D** shows the calendar for March, 2008.

11) Appellant's counsel did not mention a defense of entrapment or any other defense that could be used. The entrapment defense could have been successful had counsel done the investigating that he is required to do. He could also have used the Miranda rights not being given, the tainted evidence, criminal solicitation on the government's part, prejudicial pre-trial publicity. And that's just naming those "off the top of" Appellant's head. There was an extensive amount of defenses that Appellant's attorney could have used and talked to Appellant with but, instead he found the easiest way he possibly could to talk Appellant into pleading guilty because he knew that at the time Appellant had very limited knowledge of the justice system and Constitutional amendments and rights. There was no effort put into any investigating for any type of defense for Appellant or for any type of leniency and that's prejudicial to his client. The only thing Appellant's attorney did was talk him into pleading guilty to a crime that was in every sense of the word "illegal" from the start.

12) Appellant's attorney should have investigated the search of Appellant's vehicle. Appellant was denied his Constitutional right under the Fourth Amendment when he was unable to witness the search of his vehicle because of the media harassing him with the camera in his face as he tried desperately to move in any position to get away from the camera while an officer of the law was standing directly beside Appellant and allowing media to harass Appellant and even taking direction from the camera man to place Appellant in an area where media could openly harass him with the camera.

13) Appellant's attorney never investigated the psychological aspect of Appellant when he knew of the depth of the problem not only by Armstrong but could see it in the PSI report. **Exhibit F.**

Appellant states that in the PSI report Armstrong is asked about how he thought the Prozac was working.  Armstrong gave the response that "he believed this medication was beneficial." Later, when Armstrong was in a special housing unit at Kentucky State Reformatory because of the depression and emotional distress, Armstrong was placed back on Prozac and was informed by his psychologist that it takes four months for the medication to start working and the patient to be feeling any difference because of it.

At the time in the jail, the conductor of the PSI report had no right to ask Armstrong how he believed this medication was working because Armstrong did not know yet.  When the PSI was performed it had only been three months since Armstrong began taking the Prozac.

Appellant asserts that it's clear that many of his Due Process rights were in every way possible, violated.  Appellant's attorney ignored every Due Process violation and ditched every route for investigation to assist the prosecutor in obtaining a bogus conviction.

# ARGUMENT II

When conducting an operation the government must act with the intent to do honest justice, not any kind of justice that will get a conviction.  Appellant very much questions the intent of the government when they conducted this sting.  The fact that they had allowed the NBC media there to film the whole thing to make a television show and the use of an advocacy group that portraits itself as quite a sketchy group with very questionable tactics and a desire to hide from the truth even by disobeying orders by courts to come forward, allowing a host of a television show to interrogate before the authorities do, allowing a television show to air an episode that puts the "suspect" in the worst possible light before any court proceedings begin. There's very good reason to question the intent of the prosecution for even considering placing charges when so many Constitutional violations, and Due Process violations have taken place.

Appellant quotes from "PROSECUTORIAL MISCONDUCT AND CONSTITUTIONAL REMEDIES" By Peter J. Henning.

"In **Batson v. Kentucky,** the Court required judges to ask advocates why they exercised a peremptory challenge when it appeared to be based on the race of the juror.  While **Batson's** goal of eliminating the effect of discriminatory conduct in the selection of juries is laudable, **Batson** court's approach does more harm than good because it permits attorneys to be less

than honest in explaining their reasons in challenging a particular juror. The **Batson** inquiry results in a denigration of the judicial process when courts accept responses that 'strain credulity.'

In **Berger v. United States,** the Supreme Court asserted that the government's interest in a criminal prosecution 'is not that it shall win a case, but that justice shall be done,' and that it is therefore a prosecutor's duty 'to refrain from improper methods calculated to produce a wrongful conviction [even] as it is to use every legitimate means to bring about a just one.' This duty of prosecutors described in **Berger** furnishes the basis for courts to assert that when the government crosses the line between proper and improper methods, what has taken place is 'prosecutorial misconduct.' That label can be attached to as broad an array of acts as the prosecutor has authority to perform because the admonition to ensure 'justice' shadows every endeavor of the prosecutor. Since **Berger**, courts have applied the prosecutorial misconduct designation almost reflexively, as a shorthand method of describing whether the government attorney acted outside the bounds of acceptable advocacy. In **Demjanjuk v. Petrovsky,** 10 F.3d 338 (6th Cir. 1993), the Sixth Circuit found prosecutorial misconduct when government attorneys recklessly disregarded their duty to disclose exculpatory evidence to a defendant facing loss of citizenship and deportation for allegedly participating in the murder of Jews during World War II.

Given the assortment of interactions between prosecutors, defendants, and defense counsel, it should not be surprising that the term 'prosecutorial misconduct' does not describe

13

any particular type of act or category of violation. Courts review most prosecutorial misconduct claims under a harmless error standard, which requires that a defendant identify prejudice traceable to the violation." (The prejudice in Appellant's case is the type of charge that was put forth from allegations and that the prosecution wanted to "shine" for the television show "To Catch A Predator".) "In considering such a claim, therefore, a court need not precisely define prosecutorial misconduct because a finding of misconduct usually does not trigger relief unless the prosecutor's acts undermined the fairness of the proceeding or confidence in the jury's verdict."

"Once called upon to provide a justification for conduct in a criminal case, the government's response in most cases will probably be that its attorneys and investigators acted properly."

Appellant states that the government, in no way, could make a claim as to propriety by attorneys and investigators in his case.

"Control over the investigative process often provides the government with a substantial advantage in deciding what information to release to a defendant. For example, courts acknowledge that it is the prosecutor, not the judge, who makes the initial decision as to whether evidence in its possession is exculpatory such that it must be disclosed to the defendant. See **Kyles v. Whitley,** 514 U.S. 419, 437 (1995):

(determination of what constitutes material exculpatory evidence "must accordingly be seen as leaving the government with a degree of discretion")

In **United States v. Bagley,** 473 U.S. 667 (1985):

("[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial"); *cf. id.* At 696-97 (Marshall, J., dissenting) ("Thus, for purposes of *Brady,* the prosecutor must abandon his role as an advocate and pore through his files, as objectively as possible, to identify the material that could undermine his case.")."

When the government allowed the [media] to disclose Appellant's discovery material they

violated Appellant's Constitutional rights under the First Amendment, Wiretap disclosures.

There is no necessity, in order to avoid violation of First Amendment, to construe 18 USCS §2232(c) – which prohibits disclosure of information about federal wiretaps-so restrictively as to exclude expired wiretaps from its coverage. **United States v. Aguilar,** 515 US 593, 132 L.Ed.2d 520.  2232(a), (b) & (e)

Also:

§ 2511(e) (i) – intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, intercepted by means authorized by section 2511(2)(a)(ii), 2511(2)(b) – (c),  2511(2)(e), 2516, and 2518 of this chapter [18 USCS §§ 2511(2)(a)(ii), 2511(2)(b)-(c), 2511(2)(e), 2516, and 2518], (ii) knowing or having reason to know that the information was obtained through the interception of such a communication in connection with a criminal investigation, (iii) having obtained or received the information in connection with a criminal investigation, and (iv) with intent to improperly obstruct, impede, or interfere with a duly authorized criminal investigation, shall be punished in subsection  (4) or shall be subject to suit as provided in subsection (5).

Also:

Court's order under 18 USCS § 2516(1), authorizing wiretaps is not violated by use of state police officers to monitor federal wiretaps where state officers are under direction of Drug Enforcement Administration, at least one DEA agent is present at listening post at all times, it is clear to district judge that state officers are participating in monitoring of phone conversations, and wiretaps are monitored by both federal and state officers acting under DEA supervision. **United States v. Barker,** (1985, DC Colo) 623 F.Supp. 823.

There were [no] Drug Enforcement Agents at the sting house when Armstrong arrived and

there were [no] Drug Enforcement Agents present when the recordings took place.  These

wiretaps were illegal acts during the investigation.

In addition to declaring unauthorized wiretaps illegal, 18 USCS § 2511 renders it illegal to disclose contents of wiretaps. **Anthony v. United States,** (1981, CA10 Okla) 667 F.2d 870, cert den (1982) 457 US 1133, 73 L.Ed.2d 1350, 102 S.Ct. 2959.

Under Title 18 Crimes and Criminal Procedure:

Part I. Crimes:

Chapter 117. Transportation for illegal sexual activity and related crimes.

§ 2422. Coercion and enticement

(a) Whoever knowingly persuades, induces, entices, or coerces any individual to travel in interstate or foreign commerce, or in any Territory or Possession of the United States, to engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years or both.

# CONCLUSION

Appellant asserts that his counsel was in every possible way, ineffective from lack of investigating and was obviously prejudice to his client. Attorney did everything he could to assist the prosecution in obtaining a conviction and all the evidence proves this. Even with the tainted evidence that was handed over Appellant's attorney still should not have advised him to plead guilty.

The United States Attorney had no viable reason to set forth a prosecution when they knew of all the illegalities and Constitutional violations performed by the investigative

authorities. The intent of the prosecution is very highly questionable for the fact that so many Due Process violations were performed that it screamed of the illegalities of the sting. The prosecution also intentionally held back exculpatory evidence and gave Armstrong only tainted evidence.

Appellant states that there are new claims that he has listed that needs to be investigated for the truth of the matter. Appellant believes the court of appeals will find that there was a lot of "shady" work going on in Bowling Green, Kentucky between the United States Attorney and Appellant's attorney that is obviously questionable and tells both of ineffective assistance of counsel and prosecutorial misconduct.

Therefore, Appellant believes this Court of Appeals should GRANT his second or successive 2255 motion and the charges be dismissed or Appellant given a different attorney to have a honest chance to get back what was unjustly taken from him for 5 years.

Appellant also asks this Court of Appeals to order a stay of abeyance for the sex offender treatment class until his case is finished.

Respectfully submitted,

Lorne Armstrong, pro se Appellant

# CERTIFICATE OF SERVICE

I hereby certify that the foregoing Notice of Appeal was mailed by U.S. Mail, first class, postage prepaid, to: Clerk of Court, Deborah S. Hunt, of the United States Court of Appeals for the Sixth Circuit, 100 East Fifth Street, Room 540, Potter Stewart U.S. Courthouse, Cincinnati, Ohio 45202-3988; and Terry M. Cushing, Assistant U.S. Attorney, U.S. Attorney's Office, 5717 W. Broadway, Louisville, KY 40202 on this 4th day of March, 2013.

Lorne Armstrong, pro se Appellant

332 Waterville Rd.

Skowhegan, ME 04976

Exhibit A

7/7/09

1, Scott Wendelsdorf, agree that the United States threatened to supersede Loene Armstrong's indictment to add a charge of attempted production of child pornography (with a mandatory minimum sentence of 15 years if convicted) if he did not plead guilty to interstate travel and accept a sentence of 60 months. I will so testify if subpoenaed.

Scott P. Wendelsdorf

Guys like these:



JUSTICE

Random Convictions: tafatiw...  Good Bo...  rauch_jim  daddywa...  blaggca  craigtr...  goodbad...  mkrauss...  ArmySgt...  strongm...  [full archives]

Top 10 Most Slimy: fleet_c...  thenewp...  vamale_...  DavieWa...  kalowoo...  jackman...  smilema...  shinelf...  swgamal...  can_j_r...  [full rankings]

■ **Conviction - lorne_a_20014 - Cambridge, MA, Tennessee**

File originally posted on 1/2/2009 11:42 PM PST [Link to File]
Report made 1/2/2009 11:42 PM PST

> lorne_a_20014 (09/26/07 10:59:42 PM): first i want to make out with you
> lorne_a_20014 (09/26/07 11:00:08 PM): then while i'm making out with you, i want to start feeling your boobs
> lorne_a_20014 (09/26/07 11:00:34 PM): then i want to take off your shirt and bra
> lorne_a_20014 (09/26/07 11:00:48 PM): then i want to start sucking on your nipples ">
> lorne_a_20014 (09/26/07 11:01:16 PM): then i'm gonna move my hands down to your pants or skirt, whatever you decide to wear
> lorne_a_20014 (09/26/07 11:01:22 PM): and take them off
> lorne_a_20014 (09/26/07 11:01:46 PM): then i'm gonna take off my clothes
> lorne_a_20014 (09/26/07 11:02:05 PM): then i'll have you suck on my penis ">
> lorne_a_20014 (09/26/07 11:02:25 PM): then i'm gonna lick and suck on your clit
> lorne_a_20014 (09/26/07 11:02:35 PM): and stick my finger in you
> lorne_a_20014 (09/26/07 11:02:57 PM): then i'm gonna stick my penis in your ">< *t

You know, getting a conviction in these cases is usually incredibly easy. Can't imagine why.... hmm.

Lorne Armstrong was quite graphic in his desires and that chat.... well, let's just say that chat is longer than War and Peace in the big font for people who can't see well to read. Double spaced. Lorne laid it all out there, and likely wasn't very happy when some of Kentucky's finest laid out his future in prison when he was arrested.

He was sentenced to seven years in jail, with 20 years as a registered sex offender.

**Contributor notes from Sherry Twist**

I met Lorne during a GLEMB in Bowling Green, Kentucky that aired on Dateline, To Catch A Predator in December last year. When he first contacted me he said, "if nobody will talk to you sweetheart you can talk to me..... I'm a good guy, i have 2 nieces your age" A good guy?

A good guy doesn't solicit sex from a 13 year old and drive 85 miles to met her with a box of 14 condoms in his truck, in order to take her back to his apartment to spend the weekend  Or a good guy wouldn't expose himself to a 13 year old on his webcam almost every night for a month. He also said she would be as safe with him as she would be with her own parents. Lorne thought he was so clever and so smart that he was not going to get caught and go to jail.

He showed up on his birthday, but I don't think he got the birthday present he thought he was going to get. He didn't get to have sex with the 13 year old girl he thought he was going to, instead, he met Chris Hanson and the KBI. Happy Birthday Lorne. It looks like you will be spending the next few birthdays in prison. He plead guilty to federal charges and was sentenced to five years in Federal Prison and Life time registration as a sex offender. Also, he plead guilty to state charges and was sentenced to seven years in state prison with 305 days credit for time served, since he has been in the County jail in Bowling Green since his arrest on October 15th of last year. State sentence to run concurrent with Federal sentence and sex offender registration required by the state for five years upon release. I guess the judges didn't think you were a good guy either, Lorne.

Thank you to my phone verifier, Southern Aphrodite, she did an awesome job, as always. Also, thank you to State Attorney General, Greg Stumbo, the KBI and the Bowling Green PD for keeping Kentucky's children safe from guys like this.

This is our 305th conviction since June of 2004 and our 2nd conviction for 2009 thus far.

Please put special
attention on the
highlighted paragraph

---

**Conviction Counter**

Number of predators convicted due to Perverted-Justice.com since June 2004:

**550**

Challenge Con victions in 1
Research Convictions: 1

**Real Stories Project**

For the next six months, we're documenting actual cases of internet abductions and molestations. One case a day for at least six months. Beware, these stories can be disturbing.

**05/26/10: Man, 27, rapes girl, 12**
A 27 year old Delaware man was arrested for raping a 12 year old girl he met online.

**05/25/10: Man, 22, rapes girl, 13**
A 22 year old North Carolina registered sex offender was arrested for raping a 13 year old girl he met through Facebook.

**05/24/10: Man, 26, assaults teen girls**
A 26 year old Texas man was arrested for sexually assaulting a 13 year old girl. During the investigation police learned that the man had sexually assaulted at least five other girls. He met his victims on Facebook and MySpace.

**05/23/10: 2 men assault girl, 11**
A 29 year old Louisiana man was arrested for taking an 11 year girl across state lines and raping her. After he raped the girl he abandoned her in Mississippi where she was then picked up and raped by a 21 year old Mississippi man.

**05/22/10: 2 men assault teen girls**
A 19 year old man from Connecticut and a 18 year old man from New York sexually assaulted two teen girls they met on MySpace.

**Real Stories Project Archive**
Visit the Real Stories Project at Perverted-Justice.com

**Updates from around the Foundation**

**Perverted Justice Update**
Perverted-Justice.com hits 500 convictions!

**Perverted Justice Update**
21 arrested in Grand Rapids, Michigan

**Perverted Justice Update**
Perverted-Justice.com gets conviction 300...

**Perverted Justice Update**
Averaging two arrests a week since Apri...

**PJFI Update**
PJFI.org training academy already showing results

**PJFI.org Home**
Visit PJFI.org to see what else is going on around the Foundation

lome_a_20014 (09/17/2007 07:10:54 PM): how do you like the chat room so far?
kayla_princess94 (09/17/2007 07:11:13 PM): lol i havent looked at it
lome_a_20014 (09/17/2007 07:11:18 PM): lol
lome_a_20014 (09/17/2007 07:11:27 PM): too busy concentrating on me?lol
kayla_princess94 (09/17/2007 07:11:47 PM): lol
kayla_princess94 (09/17/2007 07:11:52 PM): looks like dumb stuff
lome_a_20014 (09/17/2007 07:11:57 PM): lol
lome_a_20014 (09/17/2007 07:12:11 PM): have you read any of it?
kayla_princess94 (09/17/2007 07:12:36 PM): no i am lookin at it now
lome_a_20014 (09/17/2007 07:12:43 PM): ok lol
lome_a_20014 (09/17/2007 07:13:13 PM): has anyone else sent you a message besides me from the chat room?
kayla_princess94 (09/17/2007 07:13:32 PM): yeah but i closed em lol
lome_a_20014 (09/17/2007 07:13:36 PM): lol
kayla_princess94 (09/17/2007 07:13:47 PM): wat they mean by a purv wats that
lome_a_20014 (09/17/2007 07:13:56 PM): hmm lol
lome_a_20014 (09/17/2007 07:14:12 PM): ok, i'll tell you lol
lome_a_20014 (09/17/2007 07:14:40 PM): it's when they talk about sex, some people think it's perverted
kayla_princess94 (09/17/2007 07:14:52 PM): k
lome_a_20014 (09/17/2007 07:15:01 PM): in other words that's all they want to talk about
lome_a_20014 (09/17/2007 07:15:16 PM): know what I mean now?
kayla_princess94 (09/17/2007 07:15:42 PM): k i guess
kayla_princess94 (09/17/2007 07:15:53 PM): they wanna talk bout it
kayla_princess94 (09/17/2007 07:15:56 PM): lol
lome_a_20014 (09/17/2007 07:16:00 PM): yup lol
lome_a_20014 (09/17/2007 07:16:02 PM): alot lol
lome_a_20014 (09/17/2007 07:16:10 PM): brb, i need another drink of water
kayla_princess94 (09/17/2007 07:16:18 PM): k
lome_a_20014 (09/17/2007 07:16:45 PM): back
kayla_princess94 (09/17/2007 07:17:02 PM): that was fast
lome_a_20014 (09/17/2007 07:17:07 PM): i'm good lol
lome_a_20014 (09/17/2007 07:17:18 PM): did you miss me?lol
kayla_princess94 (09/17/2007 07:17:29 PM): lol
kayla_princess94 (09/17/2007 07:17:34 PM): u werent gone very long
lome_a_20014 (09/17/2007 07:17:38 PM): lol
lome_a_20014 (09/17/2007 07:17:44 PM): that's because i'm good lol
kayla_princess94 (09/17/2007 07:17:51 PM): lol
lome_a_20014 (09/17/2007 07:18:11 PM): ok, so what else are we gonna talk about?lol
kayla_princess94 (09/17/2007 07:18:20 PM): idk
kayla_princess94 (09/17/2007 07:18:24 PM): wats ur name
lome_a_20014 (09/17/2007 07:18:34 PM): L o r n e
lome_a_20014 (09/17/2007 07:19:20 PM): i'm gonna guess yours is kayla?
lome_a_20014 (09/17/2007 07:19:21 PM): lol
kayla_princess94 (09/17/2007 07:20:22 PM): i got booted but im back
kayla_princess94 (09/17/2007 07:20:23 PM): lol
lome_a_20014 (09/17/2007 07:20:27 PM): ok lol
kayla_princess94 (09/17/2007 07:20:29 PM): now wat was u saying
lome_a_20014 (09/17/2007 07:20:53 PM): i'm gonna guess yours is kayla?
lome_a_20014 (09/17/2007 07:21:03 PM): hi again~h
kayla_princess94 (09/17/2007 07:21:12 PM): yeah lol
lome_a_20014 (09/17/2007 07:21:15 PM): lol
lome_a_20014 (09/17/2007 07:21:38 PM): don't tell me your last name........don't EVER tell anybody from the internet your last name ok?
kayla_princess94 (09/17/2007 07:21:52 PM): k
kayla_princess94 (09/17/2007 07:21:52 PM): y
lome_a_20014 (09/17/2007 07:22:27 PM): because there are some real weirdos on here some times and they might try to go looking for you
kayla_princess94 (09/17/2007 07:23:03 PM): wow really
lome_a_20014 (09/17/2007 07:23:07 PM): so don't ever tell them your last name, your address, your phone number, the town you live in or the school you go to
kayla_princess94 (09/17/2007 07:23:15 PM): k
kayla_princess94 (09/17/2007 07:23:20 PM): r u a wierdo
lome_a_20014 (09/17/2007 07:23:26 PM): lol
lome_a_20014 (09/17/2007 07:23:27 PM): no lol
kayla_princess94 (09/17/2007 07:23:32 PM): k
lome_a_20014 (09/17/2007 07:23:35 PM): does it sound like i am?lol

4

Exhibit C

John Iorio/KYWG/06/FDO          To   Scott Wendelsdorf/KYWG/06/FDO
03/19/2008 10:27 AM             cc

                                bcc
                            Subject   Armstrong, L

Dear Scott,

On 3/18/2008 I travelled to Warren County Jail to conduct a discovery review
with the above listed defendant.
The defendant did not wish to review the chat, also the defendant did not wish to view the pictures
that were also a part of his discovery. The defendant is ashamed and very contrite about
his circumstances. The defendant stated the he is expecting to take a plea, rather than proceed
to trial.
We also reviewed the letter you wrote to Mr. Armstrong. Mr. Armstrong is in total agreement about
waiting for his Federal case to be completed, prior to entering a plea on his State case.
I advised our client that the FDO is currently working on resolving his case, with the best
potential outcome in mind.
Mr. Armstrong's State attorney is Mr. Sam Lowe 270-846-2731

Thank you.

JDI

Case: 12-6543    Document: 22    Filed: 03/06/2013    Page: 23

Exhibit D



We tested this page and blocked content that comes from potentially
dangerous or suspicious sites. Allow this content only if you're sure it
comes from safe sites.

View all blocked con



timeanddate.com

## Calendar for March 2008 (United States)

| Sun | Mon | Tue | March Wed | Thu | Fri | Sat |
|-----|-----|-----|-----------|-----|-----|-----|
|     |     |     |           |     |     | 1   |
| 2   | 3   | 4   | 5         | 6   | 7   | 8   |
| 9   | 10  | 11  | 12        | 13  | 14  | 15  |
| 16  | 17  | 18  | 19        | 20  | 21  | 22  |
| 23  | 24  | 25  | 26        | 27  | 28  | 29  |
| 30  | 31  |     |           |     |     |     |

Phases of the moon: 7: ● 14: ◑ 21: ○ 29: ◐

Holidays and Observances: 23: Easter Sunday

timeanddate.com

Copyright © Time and Date AS 1995–2013. All rights reserved.

http://www.timeanddate.com/calendar/monthly.html?month=3&year=2008&country=1        3/2/2013

OFFICE OF THE

# FEDERAL DEFENDER

200 THEATRE BUILDING
629 FOURTH AVENUE
LOUISVILLE, KENTUCKY 40202-2461

SCOTT T. WENDELSDORF
FEDERAL DEFENDER
EXECUTIVE DIRECTOR

JAMIE L. HAWORTH
PATRICK J. BOULDIN
LAURA R. WYROSDICK
FRANK W. HEFT

TELEPHONE (502) 584-0525
TELEFACSIMILE (502) 584-2808
TOLL FREE (800) 411-4106

**Via Overnight Courier**

March 20, 2008

Mr. Lorne Lynn Armstrong
Warren County Jail
920 Kentucky Street
Bowling Green, Kentucky 42101

Re:    United States v. Lorne Lynn Armstrong
       Criminal Action No. 1:08CR-13-M

Dear Mr. Armstrong:

We have received and sent to you for your consideration a plea agreement offer from the United States which would result in a 60 month sentence—higher than the 46 month sentence the advisory guidelines would normally recommend in your case. You are currently charged with a single count of traveling in interstate commerce for the purpose of engaging in sexual conduct with a minor in violation of 18 U.S.C. §2423. The prosecutor is threatening to add an additional charge of attempted production of child pornography if you do not accept this plea agreement. He also indicates that failure to accept the plea agreement will result in any sentence in the state courts running consecutively with your federal sentence.

The apparent reason for this hardened attitude on the part of the government is the digital camera found in your possession at the time of your arrest. The government alleges that the camera was brought by you to Bowling Green for the purpose of taking pornographic photographs of what you thought would be a 13 year old girl. Attempted production of child pornography is a violation of 18 U.S.C. §2251 and carries a *mandatory minimum sentence* of 15 years imprisonment without parole. Needless to say, if the government supercedes the indictment and convinces a jury that this was your intention, your sentence would be significantly higher than the offered 60 months.

Under the existing single count indictment, the base offense level for traveling in interstate commerce for the purpose of engaging in sexual conduct with a minor is 24. To this would most likely be added 2 additional levels since a computer was used, for a total advisory offense level of 26. If the prosecutor superceded the indictment to add a count of attempted production of child pornography and you were convicted, the base offense level would be 32. To this would most likely be added 2 levels because the intended victim was under 16 and 2 levels for use of a computer to solicit participation of a minor in sexually explicit conduct, for a total advisory offense level of 36.

We have calculated your criminal history category as I. An offense level of 26 and a criminal history category of I results in an advisory sentencing range of 63 to 78 months imprisonment. An offense level of 36 and a criminal history category of I results in an advisory sentencing range of 188 to 235 months imprisonment.

### If You Go to Trial

If you go to trial, the government will supercede the indictment to add the attempted production count. If you are acquitted of both charges, that is the end of the case. The charges against you will be dismissed with prejudice, and you will be free.

If you go to trial and are acquitted of the attempted production count and convicted of the travel count only, your advisory sentence will be 63 to 78 months imprisonment. If you are convicted of both counts, your advisory guideline sentence will be 188 to 235 months imprisonment. Of course, as previously explained, the guidelines are only advisory. Both you and the prosecutor would be free to argue for any sentence that you or he deemed reasonable under the applicable sentencing statutes. However, we think it likely that Judge McKinley would sentence within the advisory guideline range. You or the government would be able to appeal any sentence imposed to the Sixth Circuit Court of Appeals. Also, you would have the right to appeal the resulting judgment to determine if any errors were made in the trial or to file a writ of habeas corpus if there were any errors that could not be presented on appeal, such as ineffective assistance of counsel.

### If You Accept the Plea Agreement

Under the plea agreement, the government agrees that 3 levels should be subtracted for timely plea and acceptance of responsibility, that no further charges will be brought arising out of this matter, and that 60 months is the appropriate sentence. The agreement requires that you agree to waive your appeal and habeas corpus rights and agree not to seek a downward departure from your criminal history category or argue for any other sentence than that provided for in the agreement. The plea agreement *would be binding* on the Judge.

*Exhibit E-3*

*no explanation of what a binding agreement is*

This means that if for any reason, the Judge does not accept the agreement, you can withdraw your plea of guilty. However, this Judge rarely fails to accept a binding plea agreement of the parties.

Under the plea agreement, your total offense level would probably be 23 and you Criminal History Category I. This would normally result in an advisory sentence of 46 months imprisonment, but you would be agreeing to a 60 month sentence in exchange for no further charges being brought and to make certain that any state time runs concurrently with your federal sentence.

The prosecutor is giving us a deadline of March 26, 2008, to accept this offer, or it will be withdrawn. Please let John or me know how you wish to proceed no later than March 25, 2008. Please call if you have any questions. If you would like to discuss this in person, I will come to Bowling Green.

Sincerely,

Scott T. Wendelsdorf
Federal Defender

3

Exhibit F

The defendant's father, Ralph Armstrong, Senior, either 70 or 71 years old, lives in Fairfield, Maine, and receives Social Security. He advised his mother, Gwendolyn Armstrong, age 67, resides in Skowhegan, Maine, where she works for a company that provides transportation assistance to disabled persons. He advised his sister, Laurie Cormier, age 45, lives in Skowhegan, Maine, where she is employed at a local convenience store and is attending college. The defendant reported his brother, Ralph Armstrong, Junior, age 44, lives in Guidford, Maine, where he is employed by DirecTV. He indicated his brother, Roy Armstrong, age 43, resides in Cornville, Maine, where he is self-employed. The defendant advised his brother, Paul Armstrong, either 41 or 42 years of age, lives with his mother and is unemployed. He reported his brother, Richard Armstrong, age 38, resides in Roundpond, Maine, where he is employed by a local automobile dealership. The defendant indicated his family members are aware of the instant charges against him and they each remain supportive of him.

37.     The defendant has never been married and does not have any children.

### Physical Condition

38.     The defendant is 5 feet, 8 inches tall, weighs 176 pounds, and has blue eyes and brown hair. He did not report having any tattoos or any significant scars or other noticeable markings. The defendant reported he was in good health and that he had no history of any health problems.

39.     The defendant advised he broke his right arm while he was in the military and that his wrist was not reset correctly. As a result, he reported his hand goes numb and lately his arm has been going numb as well. The defendant indicated he has not requested any medical treatment for this condition.

### Mental and Emotional Health

40.     According to medical information provided by the Warren County Regional Jail, on February 17, 2008, the defendant was seen by medical personnel. The medical notes indicate the defendant was crying and reported he did not belong in jail. The defendant revealed he was lured into the situation because he was vulnerable. He also declared he was not in his right frame of mind and indicated he could not understand why he had acted the way he had. It was also noted the defendant advised he has had problems in the past with his family members taking advantage of him. Medical staff left a message for the defendant to be seen by a psychology nurse and the defendant agreed to take Elavil in the interim.

41.     On February 18, 2008, the defendant was seen by a psychology nurse. The defendant denied any thoughts of self harm, but admitted to feeling very emotional and upset. He also advised he had also learned a relative had passed away a few days earlier, that all his family resides in Maine, and that he felt very lonesome. The defendant also expressed concern about his legal matters. At this time, his prescription for Elavil was discontinued and the defendant was prescribed 20 milligrams of Prozac daily. The defendant reported he believes this medication is beneficial. No further mental health information was provided.

(15)